# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| **RITA F. FIELDS,** ) | |
|    Plaintiff ) | |
| ) | |
| v. ) | Civil Action No. 2:05cv00015 |
| ) | **MEMORANDUM OPINION** |
| ) | |
| ) | |
| **JO ANNE B. BARNHART**, ) | |
|  Commissioner of Social Security, ) | By:   P<small>AMELA</small> M<small>EADE</small> S<small>ARGENT</small> |
|    Defendant ) | United States Magistrate Judge |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

*I. Background and Standard of Review*

Plaintiff, Rita F. Fields, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2003). Jurisdiction of this court is pursuant to 42 U.S.C.A. § 405(g) and § 1383(c)(3). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C.A. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through

-1-

application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Fields protectively filed applications for DIB and SSI on or about March 28, 2003, alleging disability as of July 15, 2001, based on back pain radiating into both hips and legs, migraines, depression, anxiety, neck and shoulder pain and vision problems. (Record, ("R."), 46-49, 58, 80, 289-92.) Fields's claims were denied both initially and on reconsideration. (R. at 30-32, 35, 36-38, 294-96, 300-02.) Fields requested a hearing before an administrative law judge, ("ALJ"), (R. at 39), and this hearing was held on November 4, 2004, at which Fields was represented by counsel. (R. at 308-26.)

By decision dated November 24, 2004, the ALJ denied Fields's claims. (R. at 14-22.) The ALJ found that Fields met the disability insured status requirements of the Act for disability purposes through the date of the decision. (R. at 21.) The ALJ found that Fields continued to engage in substantial gainful activity through November 6, 2003, but not thereafter.[1] (R. at 21.) The ALJ also found that Fields had

---

[1]Thus, it must be determined whether Fields was disabled between November 7, 2003, the date on which she was no longer performing substantial gainful activity, and November 24, 2004, the date of the ALJ's decision.

-2-

a severe impairment, namely degenerative disc disease with back pain, but he found that Fields did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 21.) The ALJ further found that Fields's allegations regarding her limitations were not totally credible. (R. at 21.) The ALJ concluded that Fields had the residual functional capacity to perform medium work.[2] (R. at 21.) Therefore, the ALJ found that Fields was able to perform her past relevant work as a cashier/clerk, a cashier/cook and a salad bar worker. (R. at 22.) The ALJ found that Fields was not under a disability as defined in the Act, and that she was not entitled to benefits. (R. at 22.) *See* 20 C.F.R. §§ 404.1520(f), 416.920(f) (2005).

After the ALJ issued his decision, Fields pursued her administrative appeals, (R. at 10), but the Appeals Council denied her request for review. (R. at 6-9.) Fields then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2005). This case is before this court on Fields's motion for summary judgment filed July 22, 2005, and the Commissioner's motion for summary judgment filed August 22, 2005.

### II. Facts and Analysis

Fields was born in 1949, (R. at 46, 289), which classifies her as a person of advanced age under 20 C.F.R. §§ 404.1563(e), 416.963(e) (2005). Fields has the

---

[2]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, she also can perform light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2005).

-3-

equivalent of a high school education[3] with some college credit and past relevant work experience as a cashier, a cook and a salad bar worker. (R. at 59, 64, 90, 312-14.)

At her hearing, Fields testified that she suffered a work injury in 2003 when she lifted a commercial mop bucket. (R. at 314.) She stated that she felt something pull in her back, her legs and lower back started "burning like fire" and her right leg went numb. (R. at 314.) Fields estimated that she could stand and/or walk for approximately 30 minutes or less and that she could sit for 20 to 30 minutes. (R. at 315-16.) Fields stated that she had difficulty lifting a five-pound bag of sugar. (R. at 316.)

Although Fields testified that she had been depressed since her injury, she stated that she had not been referred for any mental health treatment. (R. at 315-16.) She stated that she smothered and all she wanted to do was cry. (R. at 317.) Fields testified that she stayed at home most of the time because she did not want people to see her in pain. (R. at 319.) Fields testified that she had received treatment for depression "years ago." (R. at 317.)

Norman Hankins, a vocational expert, also was present and testified at Fields's hearing. (R. at 320-24.) Hankins classified Fields's past work as a clerk/cashier as

---

[3]Although Fields noted on her Disability Report that she has a sixth-grade education, she reported to psychologists Lanthorn and Latham that she later earned her general equivalency development, ("GED"), diploma and attended a "semester or two" at a community college. (R. at 64, 217, 257.)

-4-

light[4] and unskilled, as a cashier/cook as medium and semiskilled and as a salad bar attendant as light and unskilled. (R. at 321-22.) Hankins was asked to consider a hypothetical individual of Fields's age, education and past work experience, who had the exertional limitations set forth in the physical assessment completed by state agency physician, Dr. Randall M. Hays, M.D. (R. at 182-89, 322.) Hankins testified that such an individual could perform all of Fields's past work, as well as the jobs of a laundry worker, a kitchen worker, a maid, a cleaner and a hand packer, all at the medium level of exertion. (R. at 322.) Hankins was next asked to consider the same hypothetical individual, but who also had the nonexertional limitations set forth in the consultative evaluation and accompanying mental assessment completed by psychologist Edward E. Latham, Ph.D. (R. at 257-63, 323.) Hankins testified that such an individual could perform the same jobs previously mentioned. (R. at 323.) Hankins was then asked to assume the individual indicated in the first hypothetical, but who also had the nonexertional limitations set forth in the psychological report and mental assessment completed by psychologist B. Wayne Lanthorn, Ph.D. (R. at 215-24, 323.) Hankins testified that such an individual would be unable to perform any jobs. (R. at 324.) Finally, Hankins was asked to consider an individual of Fields's age, education and work history, but who was limited as set forth in Fields's testimony. (R. at 324.) Hankins again testified that such an individual could perform no jobs. (R. at 324.)

In rendering his decision, the ALJ reviewed records from St. Mary's Hospital; Norton Community Hospital; Stone Mountain Health Services; Dr. Kevin Blackwell,

---

[4]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2005).

D.O.; Dr. Randall Hays, M.D., a state agency physician; Julie Jennings, Ph.D., a state agency psychologist; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Holston Mental Health Center; Edward E. Latham, Ph.D., a licensed clinical psychologist; Park Avenue Wellness; Dr. Jim Brasfield, M.D.; and Dr. Robert T. Strang Sr., M.D.

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2005).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at

264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d),416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

In her brief, Fields argues that the ALJ erred by finding that she had the residual functional capacity for medium work, given her disabling back pain and severe mental impairment. (Plaintiff's Motion For Summary Judgment And Memorandum Of Law,

-7-

("Plaintiff's Brief"), at 6-9.) Fields also argues that the ALJ erred by failing to find that she suffered from a severe mental impairment. (Plaintiff's Brief at 10-12.) For the following reasons, I find that substantial evidence supports the ALJ's findings. I will address Fields's physical impairment and her mental impairment in turn.

Fields saw Dr. Candace Bellamy, M.D., on April 8, 2003, with complaints of body aches. (R. at 170.) Her muscle strength was 5/5 bilaterally in both upper and lower extremities. (R. at 170.) Dr. Bellamy gave Fields samples of Vioxx and ordered a CT scan. (R. at 170.) On May 20, 2003, Fields reported improvement of her pain with Vioxx. (R. at 169, 256.) Straight leg raising was negative and Fields's reflexes were 2+. (R. at 256.) She was prescribed Robaxin in addition to Vioxx. (R. at 169, 256.) Dr. Bellamy placed no restrictions on Fields.

On September 26, 2003, Fields saw Dr. Kevin Blackwell, D.O., for complaints of pain in her joints and elbow. (R. at 175-80.) Fields reported pain that radiated down into her groin and into both legs, tending to "draw" her feet. (R. at 175.) She noted constant back pain and leg cramping with increased activity. (R. at 175.) Fields reported having experienced back pain since 1992, and she rated her pain as seven to eight on average and eight to nine on a "bad day," based on a 10-point scale with 10 being the worst pain. (R. at 175.) A physical examination revealed slight tenderness along the trapezius posteriorly. (R. at 176.) Dr. Blackwell noted that Fields's gait was symmetrical and balanced. (R. at 177.) An upper and lower joint examination was unremarkable. (R. at 177.) Deep tendon reflexes were within normal limits, and Fields's grip strength was good. (R. at 177.) Fine motor movements of the hands were normal. (R. at 177.) Dr. Blackwell diagnosed cervical lumbar pain and limited

her to lifting items weighing up to 45 pounds occasionally and up to 20 pounds frequently. (R. at 177.) He opined that she could sit or stand for eight hours in an eight-hour day assuming normal positional changes. (R. at 177.) Dr. Blackwell noted some decreased range of motion of the cervical spine on rotation and of the shoulder on abduction and forward elevation. (R. at 179.) An x-ray of the lumbar spine showed mild degenerative changes. (R. at 181.)

On October 10, 2003, Dr. Randall Hays, M.D., a state agency physician, completed a Residual Physical Functional Capacity Assessment, finding that Fields could perform medium work. (R. at 182-89.) Dr. Hays imposed no postural, manipulative, visual, communicative or environmental limitations. (R. at 185-87.)

Fields presented to the emergency department at Norton Community Hospital on November 9, 2003, with complaints of low back pain and bilateral leg pain after lifting a mop bucket at work three days earlier. (R. at 204-07.) It was noted that Fields's back was nontender and she exhibited no pain with range of motion. (R. at 205.) She had mildly positive straight leg raises bilaterally, but her reflexes were normal. (R. at 205.) An x-ray of the lumbar spine showed mild degenerative changes with disc disease at the L5-S1 level. (R. at 208.) Fields was diagnosed with acute low back pain and was given Demerol. (R. at 205, 207.) No restrictions were placed on Fields's work-related activities.

On December 11, 2003, Fields continued to complain of low back pain. (R. at 213, 255.) A physical examination revealed positive lumbar and sacral paraspinal tenderness to palpation. (R. at 255.) However, she had negative straight leg raising

and normal strength in both lower extremities. (R. at 255.) Reflexes were 2+. (R. at 255.) Dr. Bellamy diagnosed lumbar sacral sprain and prescribed Skelaxin and Relafen. (R. at 213, 255.) An MRI was scheduled. (R. at 213, 255.) Again, no restrictions were imposed.

On January 6, 2004, Fields underwent an MRI of the lumbar spine, which revealed mild spondylitic changes of the lumbar spine, a tear in the annulus at the L3-L4 disc space level without disc herniation and a tear in the annulus with bulging of the disc in the midline at the L4-L5 disc space level with mild hypertrophy of the ligamentum flavum resulting in very mild narrowing of the spinal canal. (R. at 209-10.) Slight narrowing of the neural foramen on both sides at the L4-L5 level also was noted, as well as narrowing of the L5-S1 disc space with dessication of the discs, but without disc herniation. (R. at 210.)

Fields initiated physical therapy at Park Avenue Wellness on July 24, 2004, to treat her low back sprain. (R. at 271.) On July 30, 2004, Fields rated her then-current pain as a 9 ½ on a 10-point scale. (R. at 267.) Decreased lumbar lordosis was noted and her lumbar range of motion was limited. (R. at 267.) Fields reported decreased sensation in the abdomen and throughout the anterior thighs and lower leg to the foot. (R. at 267.) Palpation revealed severe tenderness in the lower lumbar and sacral regions. (R. at 267.) She was treated with moist heat and was instructed on home exercises. (R. at 268.) On August 2, 2004, Fields complained of increased pain. (R. at 266.) It was noted that she had poor tolerance with positioning for modalities. (R. at 266.) On August 9, 2004, Fields reporting "hurting all over." (R. at 265.) On August 11, 2004, she reported that she had to take Lortab after her previous visit. (R.

at 265.)  She complained of a burning sensation of the inner thighs and an increased sensation of numbness in her central low back.  (R. at 265.)  No restrictions were placed on Fields's work-related activities over this time period.

On August 30, 2004, Fields saw Dr. Jim Brasfield, M.D., for an evaluation of her back pain.  (R. at 276-78.)  Fields noted that, as a result of her work injury in November 2003, she continued to experience back pain associated with burning and tingling of the legs and some numbness, with the right leg possibly being a bit worse.  (R. at 276.)  Straight leg raising was negative, and no atrophy was noted.  (R. at 277.)  Fields's distal pulses were good, and she could dorsiflex her feet without pain.  (R. at 277.)  No evidence of lumbar spasm was indicated, and Dr. Brasfield noted that Fields's lumbar lordosis might be slightly straightened.  (R. at 277.)  Her range of motion of the lumbar spine was decreased.  (R. at 277.)  Dr. Brasfield reviewed the lumbar MRI performed on January 6, 2004, noting that the annulus tears were small, suggesting that they were not acute.  (R. at 277.)  He also noted no evidence of disc herniation.  (R. at 277.)  Fields was diagnosed with lumbar strain and was prescribed Zanaflex.  (R. at 277.)  Dr. Brasfield recommended a lumbar myelography, an electromyogram, ("EMG"), study of the right leg and a nuclear bone scan.  (R. at 277.)  He opined that conservative treatment was in order.  (R. at 277.)  She was advised to remain off work pending her next office visit.  (R. at 278.)  On September 7, 2004, Fields's examination and Dr. Brasfield's assessment remained unchanged.  (R. at 274.) On September 15, 2004, Fields underwent an EMG study of the right leg, which yielded normal results.  (R. at 272.)  She underwent a lumbar myelogram on September 21, 2004, which revealed moderate to moderately severe degenerative spinal stenosis at the L4-L5 level and milder degenerative spinal stenosis at the L2-L3

and L3-L4 levels. (R. at 279-80.) A bone scan was unremarkable with the exception of a possible old injury to the right ninth rib. (R. at 281-82.) On September 30, 2004, Dr. Brasfield noted that the lumbar myelography revealed no evidence of disc herniation or spondylolisthesis. (R. at 272.) Fields noted that some of her back pain radiated up into her neck and shoulders. (R. at 272.) She was diagnosed with limited lumbar strain without neurological deficit. (R. at 272.) Dr. Brasfield again recommended that Fields defer working pending her next office visit in approximately one week. (R. at 273.) He prescribed Darvocet. (R. at 273.)

On October 19, 2004, Fields saw Dr. Robert T. Strang Sr., M.D., an orthopaedist. (R. at 283.) Fields continued to complain of low back pain radiating into the right leg, worsened by all activity. (R. at 283.) She was diagnosed with a back sprain and was advised to continue doing back exercises. (R. at 283.) Dr. Strang advised Fields to remain off work until receiving a functional capacity evaluation. (R. at 283.) Apparently, Fields never pursued this evaluation.

On October 22, 2004, Fields presented to the emergency department at Norton Community Hospital after being involved in a motor vehicle accident. (R. at 285-88.) She complained of a headache, neck pain, low back pain and right knee pain. (R. at 287.) She exhibited right knee tenderness and neck pain. (R. at 285, 287.) Fields was diagnosed with neck strain, lumbar strain and a concussion. (R. at 286.) She was given Toradol, Norflex and Zanaflex, and a cervical collar was applied. (R. at 288.)

Given this evidence of conservative treatment with medications and physical therapy, no more than minimal findings on physical examinations and objective

-12-

medical testing and no more than minimal restrictions on Fields's work-related activities, I find that substantial evidence supports the ALJ's residual functional capacity finding as regards her back impairment. I further note that despite complaints of disabling back pain, Fields reported as recently as April 2004, that she enjoyed working in her yard, planting flowers, attending weekly bingo games, traveling, visiting others and playing cards. (R. at 258.)

I will next discuss Fields's mental impairment, whether the ALJ erred by failing to find that it was severe and whether substantial evidence supports the ALJ's residual functional capacity finding based thereon. For the following reasons, I find that substantial evidence exists in the record to support such findings.

The regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. §§ 404.1521(a), 416.921(a) (2005). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. §§ 404.1521(a), 416.921(b) (2005). The Fourth Circuit held in *Evans v. Heckler*, that "'"[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience."'" 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984) (citations

-13-

omitted).

The record reveals a diagnosis of depression as early as 1992, when Fields was admitted to St. Mary's Hospital after overdosing on painkillers in conjunction with alcohol. (R. at 133-43.) She stated that she did so after fighting with her daughter. (R. at 133.) After a psychiatric consult, it was determined that Fields had no suicidal ideations. (R. at 134.) She was referred for counseling at Holston Mental Health Clinic, which she attended from November 18, 1992, through February 10, 1993. (R. at 135, 239-53.) On November 18, 1992, she was diagnosed with major depression. (R. at 253.) On December 17, 1992, Her mood was described as moderately depressed. (R. at 249.) She was diagnosed with major depression, recurrent, moderate. (R. at 249.) On January 6, 1993, Fields was diagnosed with an adjustment disorder with depressed mood. (R. at 242.) On January 20, 1993, and again on February 10, 1993, Fields reported improvement in her mood. (R. at 241.) On September 1, 1993, Fields's chart was closed for noncompliance after she missed two sessions and failed to respond to efforts to contact her. (R. at 239.)

There is no further evidence pertaining to Fields's mental impairment until April 8, 2003, when she saw Dr. Bellamy. At that time, Fields reported that her main complaint was her "nerves," and she requested medication. (R. at 170.) However, the treatment note contains no subjective allegations of anxiety-related symptoms by Fields or no discussion of findings related thereto by Dr. Bellamy. Instead, the treatment note focused on Fields's physical complaints. In any event, Dr. Bellamy diagnosed Fields with anxiety and prescribed Lexapro. (R. at 170.) By May 20, 2003, Fields reported that Lexapro was helping her condition. (R. at 169, 256.)

On October 14, 2003, Julie Jennings, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Fields suffered from a nonsevere affective disorder. (R. at 190-203.) She found that Fields was only mildly restricted in her activities of daily living, experienced mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and never experienced repeated episodes of decompensation. (R. at 200.) Jennings opined that Fields's symptoms were only partially credible. (R. at 203.)

Fields saw B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, on February 24, 2004, for a psychological evaluation at the referral of her counsel. (R. at 215-22.) Lanthorn described Fields's mood as predominantly anxiety-laden with clear signs of depression. (R. at 217.) Fields reported that she had been depressed for the previous 10 or 11 years, and she noted that her memory had progressively worsened over the previous four to five months. (R. at 218.) Fields also reported concentration difficulties, but denied suicidal or homicidal ideation, plan or intent. (R. at 218-19.) She reported becoming nervous at times and short of breath, but denied specific difficulties with panic attacks. (R. at 219.)

Lanthorn administered the Wechsler Adult Intelligence Scale - Third Edition, ("WAIS-III"), test, on which Fields obtained a verbal IQ score of 77, a performance IQ score of 85 and a full-scale IQ score of 79, placing her in the borderline range of intellectual functioning. (R. at 216, 219.) These test results were deemed valid by Lanthorn. (R. at 219.) Lanthorn also administered the Pain Patient Profile, ("P/3"), on which she scored high on the Somatization, Anxiety and Depression scales. (R. at 220.) These results also were deemed valid. (R. at 220.) Fields was diagnosed

with major depressive disorder, recurrent, severe, pain disorder associated with both psychological factors and a general medical condition, chronic, and borderline intellectual functioning. (R. at 221.) Lanthorn placed her Global Assessment of Functioning, ("GAF"), score at 45-50.[5] (R. at 221.) Lanthorn noted that Fields was taking no medication for depression. (R. at 221.) He opined that Fields had moderately severe limitations in her overall adaptability skills, and he recommended that she seek professional mental health services. (R. at 222.)

Lanthorn also completed a mental assessment, indicating that Fields was markedly limited in her ability to understand, remember and carry out detailed instructions, to interact appropriately with the public, to interact appropriately with supervisors, to interact appropriately with co-workers, to respond appropriately to work pressures in a usual work setting and to respond appropriately to changes in a routine work setting. (R. at 223-24.) She was found to be moderately limited in her ability to make judgments on simple work-related decisions and only slightly limited in her ability to understand, remember and carry out short, simple instructions. (R. at 223.)

Fields saw Edward E. Latham, Ph.D., for a psychological evaluation on April 26, 2004. (R. at 257-60.) Although she reported taking Paxil at that time, there is no evidence in the record to substantiate this. (R. at 258.) Fields's mood was depressed,

---

[5]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, (DSM-IV), 32 (American Psychiatric Association 1994). A GAF of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning ...." DSM-IV at 32.

Case 2:05-cv-00015-PMS   Document 14   Filed 09/22/05   Page 16 of 20   Pageid#: 89

but she persevered on difficult tasks. (R. at 258.) She denied any recurrent severe panic episodes. (R. at 258.) Fields reported washing clothes, straightening up, working in the yard, planting flowers, attending bingo games, traveling, visiting others and playing cards. (R. at 258.) Latham noted that although Fields presented a profile that indicated significant anxiety, she denied symptoms of anxiety during the interview. (R. at 259.) Latham further noted that all of the clinical scales were elevated to such a degree that he did not believe Fields's profile was a valid representation of her true clinical status. (R. at 259.) Latham concluded that Fields was of average to low average intelligence with some difficulty in educational skills. (R. at 259.) He noted that she presented a symptom history consistent with a unipolar mood disorder. (R. at 259.) Fields was diagnosed with depressive disorder, not otherwise specified. (R. at 259.) However, Latham noted that Fields appeared able to understand, retain and follow simple instructions and perform routine, repetitive tasks. (R. at 259.) He opined that Fields's attention/concentration skills appeared sufficient for simple tasks and her ability to relate interpersonally appeared unimpaired. (R. at 259.) Fields's ability to handle everyday stressors appeared only mildly impaired. (R. at 259.)

Latham also completed a mental assessment, finding that Fields had a fair ability in all areas of occupational, performance and personal/social adjustments, with the exception of the ability to understand, remember and carry out complex instructions, which Latham opined was poor. (R. at 261-63.)

In his decision, the ALJ accepted the opinions of psychologist Latham and the state agency psychologist, while rejecting the opinion of psychologist Lanthorn. (R.

at 19, 20.) I find that substantial evidence supports this weighing of the evidence. As the ALJ noted, Lanthorn's February 2004 opinion appears to be based primarily on Fields's emotional difficulties in 1992 and 1993, as well as her subjective allegations of symptoms of depression and anxiety. The ALJ further noted in his decision that he was rejecting Lanthorn's findings regarding Fields's IQ scores, as well as her GAF score of 45 to 50. (R. at 19.) The ALJ stated that he was doing so because IQ testing results obtained while Fields was in the third grade revealed a full-scale IQ score of 74[6] and, by the fourth grade, a full-scale IQ score of 82,[7] which, the ALJ noted, would not preclude the performance of unskilled work. (R. at 19, 91, 94.) I further note that this evaluation and assessment by Lanthorn was completed two months before Fields stopped performing substantial gainful activity. Moreover, Lanthorn's findings are inconsistent with the evidence of record as a whole.

The ALJ noted in his decision that he was accepting the opinions of psychologists Latham and Jennings. (R. at 20.) I find that substantial evidence supports this weighing of the evidence. On October 14, 2003, state agency psychologist Jennings found that Fields suffered from a nonsevere affective disorder which resulted in only mild restrictions on her activities of daily living, her ability to maintain social functioning and her ability to maintain concentration, persistence or pace. (R. at 190-203.) She further found that Fields had never experienced repeated

---

[6]Despite the ALJ's finding, I am unable to locate any IQ scores for Fields's third-grade school year in the record. The school record which contains this IQ score also contains information on her third-grade year, but indicates that the IQ score of 74 was "for fourth grade." (R. at 93.)

[7]The ALJ actually stated that Fields had an IQ score of 84 in the fourth grade, but the school records contained in the record indicate a total IQ score of 82 for that academic year. (R. at 91, 94.)

-18-

episodes of decompensation. (R. at 200.) Likewise, in April 2004, psychologist Latham found that Fields was of average to low average intelligence with some difficulty in educational skills. (R. at 259.) Although she was diagnosed with depressive disorder, not otherwise specified, Latham noted that Fields appeared able to understand, retain and follow simple instructions and perform routine, repetitive tasks. (R. at 259.) He opined that Fields's attention/concentration skills appeared sufficient for simple tasks and her ability to relate interpersonally appeared unimpaired. (R. at 259.) Fields's ability to handle everyday stressors appeared only mildly impaired. (R. at 259.) Latham found that Fields retained a satisfactory ability to perform the vast majority of occupational, performance and personal/social adjustments. (R. at 261-62.)

I note that Jennings's and Latham's findings are further supported by the lack of mental health treatment sought by Fields from the period 1993 to 2003. Moreover, the treatment sought by Fields in 2003 consisted only of a request for medication for her "nerves." (R. at 170.) Although Fields reported taking Paxil in April 2004, there is no evidence contained in the record to substantiate this.

For all of these reasons, I find that substantial evidence supports the ALJ's failure to find that Fields suffered from a severe mental impairment, as well as his finding regarding her residual functional capacity.

*III. Conclusion*

-19-

For the foregoing reasons, Fields's motion for summary judgment will be denied, the Commissioner's motion for summary judgment will be granted and the decision of the Commissioner denying benefits will be affirmed.

An appropriate order will be entered.

DATED: This 22nd day of September, 2005.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE